1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ROBERT R. GRAHAM )  Case No. CV 11-06533-DMG (JCGx)
                 )
            Plaintiff, )  **FINDINGS OF FACT AND**
                 )  **CONCLUSIONS OF LAW**
      v.         )
                 )
UNITED STATES OF AMERICA, )
                 )
            Defendant. )
                 )
_____ )

    This matter is before the Court following a bench trial which took place on November 13, 2012.  Robert L. Coit and Barbara Ann Landan appeared on behalf of Plaintiff, Robert R. Graham.  Robert F. Conte and Valerie L. Makarewicz appeared on behalf of Defendant, United States of America.

    Having carefully reviewed the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**I.**

**FINDINGS OF FACT**

    1.    On July 2, 2008, Plaintiff Robert R. Graham filed a Claim for Refund and Request for Abatement with the Internal Revenue Service ("IRS") seeking

1    reimbursement for a Trust Fund Recovery Penalty ("TFRP") collected from him pursuant
2    to 26 U.S.C. § 6672.  (Trial Ex. 1.)  The IRS denied Graham's claim on September 10,
3    2009.  (Trial Ex. 3.)

4         2.    On August 9, 2011, Graham filed a Complaint against the United States of
5    America seeking a refund of his TFRP payment [Doc. #1].

6                                    **Murray Trenchless**

7         3.    Graham began working for Murray Trenchless ("M.T."), a construction
8    company located in Yorba Linda, California, in May 1998.  (Admitted Facts D, E.)
9    Graham worked as M.T.'s Construction Manager.  (*Id.*)  John Murray was the President
10   of M.T.

11        4.    M.T. filed for bankruptcy on December 26, 2000.  (Admitted Fact G.)
12   Graham knew that M.T. had declared bankruptcy.  (Admitted Fact H.)  Graham was not
13   listed as a creditor on M.T.'s bankruptcy schedules.  (Trial Ex. 121.)

14        5.    When M.T. filed for bankruptcy, it had failed to pay more than $50,000 in
15   federal taxes for the periods ending December 31, 1999 and March 31, 2000.[1]  (Trial Ex.
16   126.)

17                          **Formation of Underground Ventures**

18        6.    Around the time of M.T.'s bankruptcy, Murray told Graham that forming a
19   new company, Underground Ventures ("U.V."), would be a way to continue working and
20   save M.T.'s equipment and machinery from the bankruptcy.  (Admitted Fact I.)  Murray
21   did not have experience in the underground construction business.

22        7.    U.V. did the same type of work and occupied the same office as had M.T.
23   (Admitted Facts E, J, K.)

---

26   [1] Graham found documents evidencing M.T.'s failure to pay federal taxes in May 2009 when he
     visited the company's storage unit in preparation for an interview with an IRS agent in July 2009.  (*See*
27   Trial Exs. 19, 126, 127.)  Despite this, Graham told the IRS agent that he had never been involved in
     another business that had tax problems.  He maintained at trial that he did not learn about M.T.'s failure
28   until after the July 2009 interview.

8.      Graham invested $40,000.00 when U.V. was formed.  Of that investment, $10,000.00 was to go to U.V., and the balance was to go to three affiliated companies.  In exchange, Graham was to receive a 4% ownership in U.V., but no shares ever issued.

9.      Murray told Graham that 94% of U.V.'s shares were to be issued in Mark Flach's name, to be held on behalf of Murray.  In fact, 93.5% of U.V.'s shares were issued to Flach.[2]  (Trial Ex. 12 at 2.)

### Graham's Position as an Officer of U.V.

10.     Graham was the named Vice President of U.V.  (Admitted Fact L.)  Graham was listed and signed as U.V.'s Vice President on the company's May 15, 2000 filing with the Employment Development Department, which is a taxing authority for the State of California.  (Admitted Fact P.)  Mark Flach was the company's Treasurer and Patricia Steffens was the company's Secretary.  (Admitted Facts M, N.)

11.     U.V.'s organizational minutes, dated April 3, 2000, name Graham as Vice President.  (Trial Ex. 115 at H4.)  The minutes are not signed.  (*Id.* at H12.)

12.     Even though Murray was not an officer of U.V., Graham testified that he considered Murray to be "the boss" at U.V., and he believed that Murray had final decision-making authority on all administrative matters at the company.  Murray testified that he was a "consultant" at U.V.

13.     Graham was authorized by Murray to represent himself as the President of U.V. to customers and potential customers.  (Admitted Fact O.)

14.     Graham identified himself as the company's president on authorization documents filed with U.V.'s bank, Whitney National Bank.  (Admitted Fact U.)

15.     Graham held himself out as an officer and "co-owner and President" of U.V. on at least one job application.  (Trial Ex. 109.)

---

[2] Flach testified that he held the shares for himself, not on behalf of Murray.

### Graham's Managerial Authority at U.V.

16.     At U.V., Graham continued to work primarily out of the office as Construction Manager at sites all over the country, as he had done at M.T.  While in the field, Graham called the U.V. office several times each day.

17.     Graham's experience made him uniquely qualified to solicit and carry out construction projects for U.V.

18.     Graham solicited, qualified, and signed U.V.'s work contracts.  (Admitted Fact CC.)  He procured project bids and estimated the resources, including equipment, manpower, and number of hours that the company would need to carry out a project. Murray used the information provided by Graham to calculate cost estimates for project bids.

19.     In the field, Graham secured temporary accommodations for himself and his crew, and he located equipment yards and temporary office space for use during each job. (Admitted Fact DD.)  Graham ran the field site, construction, and field personnel, including hiring and firing day laborers, equipment operators, and truck drivers. (Admitted Facts EE, FF.)  He also had authority to terminate certain contracts.  (Trial Ex. 115.)  Neither Murray nor Flach possessed the experience and expertise that Graham had which allowed him to manage field operations.

20.     Graham oversaw in-house crews and subcontractors, verified productivity for billing, and generally monitored all administrative functions of the field sites. (Admitted Facts GG, II.)  He was responsible for ensuring that projects were completed properly and efficiently.

21.     Graham verified daily time sheets for the site workers, faxed the time sheets to U.V.'s office as needed, and received paychecks from U.V.'s office and distributed them to site workers.  (Admitted Facts JJ, KK.)

22.     Graham was also involved, to at least some degree, in the management affairs of U.V.'s affiliated companies.   On January 23, 2001, Graham signed an

agreement with Dave Cervantes, a former shareholder of the affiliate D.C. Drilling, in which Cervantes relinquished his interest in the company. (Trial Ex. 115.)

## Graham's Knowledge of U.V. Administrative Functions

23. To Graham's knowledge, Murray, Flach, and Steffens all worked full-time in U.V.'s office; Graham was the only officer who spent most of his time in the field. Graham assumed that Steffens, as the Office Manager, was responsible for preparing checks on behalf of U.V.

24. During January 1, 2001 through September 30, 2001, when Graham was not traveling he worked from home or commuted to U.V.'s office in Yorba Linda. (Admitted Fact TT.) During these periods, Graham spent most of his time on the telephone obtaining work and attempting to collect on unpaid accounts. (Admitted Fact SS.)

25. U.V.'s officers and Murray held regular administrative meetings at the company's office, which Graham attended when he was not working in the field. At the meetings, the officers and Murray discussed work prospects, the payment of bills, and other company business. Graham offered his opinions as to which creditors should be paid. Specifically, he advocated that site workers be paid because those were the bills with which he was familiar, and because the workers would not work unless they were paid. Graham often had to leave these meetings to speak on the telephone. Graham estimates that he attended four such meetings in 2001.

## Graham's Control over U.V.'s Finances

26. Throughout 2001, U.V. held an account with Whitney National Bank, which Graham had opened as President of U.V. (Admitted Fact S.) Murray, Flach, Steffens, and Graham all had signatory authority over the Whitney Bank Account until July 16, 2001. (Trial Ex. 117.) On that date, Steffens was removed from the account. (*Id.*)

27. A signature stamp bearing Graham's signature was made and kept in the U.V. office on August 21, 2001. (*See* Trial Ex. 129.) Throughout 2001, checks were signed on behalf of U.V. using Graham's signature stamp, both before and after he left

U.V. in October 2001.  (Admitted Fact AA.)  Graham understood that, by creating the stamp, he authorized Murray to use the stamp outside of his presence.

28.    Graham understood that all checks drawn from U.V.'s main account required two signatures.  He believed this because Murray told him it was true during the formation of U.V.

29.    As early as December 27, 2000, Graham co-signed checks on behalf of U.V. to various payees.  (Admitted Facts V, Y.)

30.    In 2001, Graham personally signed over 275 checks on behalf of U.V., and his signature stamp was used on an additional 66 checks.  (Trial Ex. 102.)  The checks Graham signed included payroll checks to both field and office employees, payments to himself for work-related expenses and sums he advanced on behalf of the company, and payments to creditors.  (*Id.*; Admitted Facts OO, PP.)  The checks Graham signed also included checks to U.V.'s affiliated companies.  (Trial Ex. 102 at A104.)  Graham sometimes approved his own reimbursements.  (Trial Ex. 112.)

31.    At least four checks signed by Graham—Check Nos. 2300, 2301, 2302, and 2303—were issued with Graham's signature alone.  (Trial Ex. 102 at A75.)  These checks were all payroll checks made out to employees.

32.    Graham frequently signed many checks in one sitting, often while he was engaged in other tasks such as speaking with clients on the telephone.  He was often presented with stacks or sheets of checks to sign by other officers of U.V.

33.    Having worked in construction for over 30 years, Graham understood that the government withholds certain taxes from employee paychecks.

34.    Graham's signature appears on at least one check, Check No. 2097, dated March 15, 2001, that remitted payment to the State of California Employment Development Department.  (Trial Ex. 102 at A26.)

35.    Graham signed Check No. 3039, dated July 30, 2001, made out to Whitney National Bank for $10,000 for "Federal Tax Deposit" on behalf of U.V.  (Trial Ex. 105.) The check listed U.V.'s employee identification number and stated "Trust Fund Portion

Only, 6/30/01." (*Id.*)  This was the first check to the IRS that Graham had ever signed.  It was also the largest check that Graham had ever signed on behalf of U.V.

### U.V.'s Financial Difficulties and Failure to Make Trust Fund Payments

36.     On July 16, 2001, Graham signed the Whitney National Bank Deposit Account Resolutions and Authorizations form that removed Steffens' signatory authority from the U.V. account.  (Trial Ex. 117.)  According to Flach, Steffens had become very vocal in the office about her concerns regarding U.V.'s deteriorating financial state, and the other officers believed it was best if she leave the company.  Graham signed this document as "President" of U.V.  (*Id.* at L2.)

37.     Graham received Check No. 3084 from U.V., dated August 7, 2001 and signed by Murray and Flach, in the amount of $800.00.  (Admitted Fact QQ.)  Check No. 3084 was later returned to Graham "Returned Unpaid NSF."  (*Id.*)

38.     Graham received Check No. 3109 from U.V., dated August 10, 2001 and signed by himself and Murray, in the amount of $2,082.13.  (Admitted Fact RR.)  Check No. 3109 was later returned to Graham "Returned Unpaid NSF."  (*Id.*)

39.     Graham received Check No. 2346 from U.V. in payment of his biweekly salary, which was returned from the bank due to insufficient funds.  (Trial Ex. 119 at 16.)  Whitney National Bank sent U.V. notice of the insufficient funds for this check on June 4, 2001.

40.     Graham signed Check No. 3140, dated August 29, 2001, made out to Performance Drilling for $11,500.00, and Check No. 3150, dated August 31, 2001, made out to himself for $3076.92.  (Trial Ex. 102 at A122-23.)  Neither of these checks was returned due to insufficient funds.

41.     Graham resigned from U.V. on October 12, 2001.  (Trial Ex. 19.)

42.     For the quarter ending March 31, 2001, U.V. owed $45,825.58 in employment taxes.  (Trial Ex. 123 at S2.)  For the quarter ending June 30, 2001, U.V. owed $30,482.31 in employment taxes.  (Trial Ex. 124 at T2.)  For the quarter ending September 30, 2001, U.V. owed $7,591.07 in employment taxes.  (Trial Ex. 125 at U6.)

43.    On March 18, 2005, the IRS assessed Graham for a TFRP to recover U.V.'s unpaid trust fund contributions for the first three quarters of 2001 plus interest, totaling $59,355.25.  (Trial Ex. 122.)  Graham paid the TFRP on June 13, 2008.  (Trial Ex. 1.)

## II.

## CONCLUSIONS OF LAW

1.    The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1346(a)(1) as an action against the United States for the recovery of internal revenue tax alleged to have been erroneously assessed.  Venue is proper in the Central District of California because Plaintiff resides in this District.

2.    Under 26 U.S.C. §§ 3102 and 3402, employers are required to withhold federal social security and income taxes from their employees' wages.  These withheld taxes constitute a special fund held in trust for the United States under 26 U.S.C. § 7501. *See Slodov v. United States*, 436 U.S. 238, 242-45, 98 S. Ct. 1778, 56 L. Ed. 2d 251 (1977).  Section 3102 imposes personal liability on the employer in the event it fails to pay over the funds held in trust.

3.    Graham was assessed the TFRP pursuant to 26 U.S.C. § 6672(a), which allows the United States to collect a penalty from any person "required to collect, truthfully account for, and pay over any tax imposed by [Title 26] , or [who] willfully attempts in any manner to evade or defeat any such tax or the payment thereof."

4.    An IRS assessment, once established by a Certificate of Assessment, is *prima facie* evidence of the taxpayer's liability under section 6672.  *See Norcal Gold, Inc. v. Laubly*, 543 F. Supp. 2d 1132, 1136 (E.D. Cal. 2008) (citing *Oliver v. United States*, 921 F.2d 916, 919 (9th Cir. 1990)).  The Certificates of Assessment against Graham establish that Graham is *prima facie* liable as a "responsible person" under Section 6672.

5.    To obtain a refund of the TFRP payment, Graham must establish, by a preponderance of the evidence, that he is not a "responsible" person within the meaning of Section 6672 and did not "willfully" fail to collect, account for, or pay over U.V.'s

withheld taxes.  *See Turner v. United States*, 423 F.2d 448, 449 (9th Cir. 1970); *United States v. Jones*, 33 F.3d 1137, 1139 (9th Cir. 1994).

## **Graham Was a Responsible Person at U.V.**

6.    A person is "responsible" under section 6672 if he is required to collect, account for, or pay over taxes.  Persons with actual authority or power to ensure that taxes are paid are considered responsible under the statute.  *See Slodov*, 436 U.S. at 250.

7.    "Responsibility" is not limited to a single individual, and the individual need not have exclusive authority over corporate finances or management decisions to be liable.  *See Turner*, 423 F.3d at 449; *see also Alsheskie v. United States*, 31 F.3d 837, 838 (9th Cir. 1994) (finding the defendant not "responsible" because the parent corporation essentially prevented him from carrying out his financial duties in a timely manner) (internal citations omitted).

8.    Courts have held that the following factors are significant in determining whether an individual is "responsible" under section 6672:  (1) position as an officer of the corporation; (2) management of the day-to-day operations of the company; (3) control over corporate finances, including ability to make decisions as to payment of creditors and disbursement of funds; (4) the power to draw and sign checks; (5) authority to sign corporate tax returns; and (6) ability to hire and fire employees.  *Larson v. United States*, 76 F. Supp. 2d 1092, 1096 (E.D. Wash. 2000); *see also Jones*, 33 F.3d at 1140.  The Ninth Circuit has held that the most critical factor is whether the individual has "significant control over the enterprise's finances."  *Jones*, 33 F.3d at 1139; *Purcell v. United States*, 1 F.3d 932, 936 (9th Cir. 1993) (sole authorized signatory who was president and sole shareholder was liable under section 6672 despite delegation of financial matters to another officer); *Turner*, 423 F.2d at 449-50 (company officer whose signature was required for all company checks was liable under section 6672 because his role in handling the company's finances was "far from trivial").

9.    First, Graham was an officer of U.V.:  not only was he the vice president of record with the State of California, Employment Development Division, but sometimes

-9-

he also held himself out as co-owner and/or president to third parties, including the Whitney National Bank and on job applications.

10. Second, although Graham did not manage the operations of U.V.'s office, he exercised significant decision-making authority over operations off-site as the company's construction manager.

11. Third, Graham had at least some power to decide which creditors to pay and to disburse funds.

12. Fourth, Graham had signatory authority on the Whitney Bank account and routinely exercised the power to draw and sign checks. As to the fifth factor, there is no evidence that Graham had authority to sign corporate tax returns.

13. Finally, as noted above, Graham had authority to hire and fire day laborers, equipment operators, and truck drivers that were required on remote job sites supervised by Graham. There is no evidence that Graham had authority to fire any office employees.

14. Having considered all of the factors, the Court finds that Graham was a responsible person at U.V. under Section 6672. His significant involvement in obtaining and carrying out the company's business, supervisory duties, authority to sign checks, including to the IRS, and position as vice president of the company demonstrate that he was a "responsible" person within the meaning of Section 6672.

### **Graham Willfully Failed to Pay Over Federal Withholding Taxes**

15. A responsible person is liable under Section 6672 if he or she "willfully" fails to cause taxes to be paid.

16. "Willfulness" is a voluntary, conscious, and intentional act to prefer other creditors over the government. *Davis v. United States*, 961 F.2d 867, 871 (9th Cir. 1992). Intent to defraud the government or other bad motive need not be proven. *Id.*

17. The willfulness prong is satisfied "[i]f a responsible person knows that withholding taxes are delinquent, and uses corporate funds to pay other expenses, even to meet the payroll out of personal funds he lends the corporation." *Phillips v. IRS*, 73 F.3d

939, 942 (9th Cir. 1996). In other words, one who acts with "reckless disregard" acts willfully under Section 6672. *Id.*; *see also Davis*, 961 F.2d at 876 ("[T]here is a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so when there is knowledge of the liability . . . constitutes willfulness.").

18.    The government must, however, prove more than "mere negligence." *Klotz v. United States*, 602 F.2d 920, 924 (9th Cir. 1979).

19.    In *United States v. Leuschner*, 336 F.2d 246, 247 (9th Cir. 1984), the plaintiff , a "responsible" person, worked mostly in the field handling sales, supervising the harvesting and shipping of the company's products, and running the business, and he was rarely at the company office. The plaintiff was a co-signer on the company's checks, and he left signed checks in the office for use in his absence; he relied entirely on his partner to run the company's finances, including complying with tax obligations. *Id.* The company failed to pay its withholding taxes and the plaintiff was assessed a TFRP. *Id.* at 247. The court held that the plaintiff's conduct with respect to his first business venture was not "willful," but was merely negligent. *Id.* at 248. When the plaintiff and his partner started a second company, however, and the same failure took place, the court found that the plaintiff's conduct was "willful" because "[h]e had a duty to see that the taxes were paid," but he failed to inquire despite having knowledge of his partner's past failure to carry out that duty. *Id.*

20.    In *Phillips v. IRS*, the plaintiff, President of an airline, delegated authority to manage the company's finances to an administrator after he suffered an accident that caused him to become house-bound. 73 F.3d at 940. The plaintiff knew that the administrator had allowed the company's tax obligations to go into arrears in the past, so he took some measures to monitor her work. *Id.* at 941. Nevertheless, the administrator never mentioned to the plaintiff that the taxes were not being paid, and the plaintiff did not ask. *Id.* The Ninth Circuit concluded that the plaintiff "willfully" failed to pay the

company's taxes because he acted with "reckless disregard" by not inquiring as to whether the withholding taxes were being paid. *Id.* at 945.

21.    Here, although Graham knew that M.T. had filed for bankruptcy prior to the formation of U.V., it is not clear that Graham knew that M.T.'s withholding taxes were in arrears.

22.    Nevertheless, other evidence strongly suggests that Graham willfully failed to pay over U.V.'s withholding taxes.  First, on July 16, 2001, Graham authorized the removal of Steffens' signatory authority on the Whitney Bank Account.  (Trial Ex. 117.) Although Graham testified that he did so only at Murray's direction, Flach testified that Steffens was very vocal about the company's finances around that time.  Next, Graham signed Check No. 3039, dated July 30, 2001, made out to Whitney National Bank for $10,000 for "Federal Tax Deposit" on behalf of U.V.  (Trial Ex. 105.)  The check listed U.V.'s employee identification number and stated "Trust Fund Portion Only, 6/30/01." (*Id.*)  Third, Graham received three checks from U.V.—Check No. 3084, Check No. 3109, and Check No. 2346—all of which were not cashed due to insufficient funds. (Admitted Facts QQ, RR, Trial Ex. 119 at 16.)

23.    In August 2001, after being placed on notice that U.V.'s bank account lacked sufficient funds to pay creditors and that U.V. had made at least one "partial" payment of withholding taxes, Graham signed two more checks—Check No. 3140 and Check No. 3150—in payment to other creditors.    (Trial Ex. 102 at A122-23.) Specifically, these checks made payments to Performance Drilling, one of U.V.'s affiliates, and to Graham himself.  (*Id.*)  Neither of these checks was returned due to insufficient funds.

24.    Graham's failure to inquire about U.V.'s tax obligations at this time—after personally witnessing the company's financial struggles and signing checks to other creditors, including himself—was not only unreasonable, it was reckless.  A reasonable person would likely have been placed on notice of the potential problem when asked to sign a check labeled "Trust Fund *Portion Only*," that included the company's Federal

employee identification number.  Nevertheless, Graham failed to inquire not only when he signed such a check, but after his own checks were uncashed due to insufficient funds and after another officer left the company because if its financial woes.

25.    The Court finds implausible Graham's explanation that he had no knowledge or understanding of U.V.'s finances and therefore was not on notice that the withholding taxes were in arrears.  Graham's actions demonstrate that he preferred other creditors over the IRS with constructive, if not actual, knowledge that the company was not complying with its tax obligations.  *See Davis*, 961 F.2d at 871.  Accordingly, Graham "willfully" failed to cause U.V.'s taxes to be paid within the meaning of Section 6672.

## III.

## CONCLUSION

1.    Under 26 U.S.C. § 6672, Graham was a person "required to collect, truthfully account for, and pay over any tax imposed by [Title 26]," who "willfully" failed to collect or truthfully account for and pay over such tax.

2.    Graham willfully failed to cause U.V. to pay withholding taxes as required under 26 U.S.C. §§ 3102 and 3402 because, as a "responsible" person at U.V., he acted with reckless disregard as to whether the company was meeting its tax obligations.

3.    The United States' assessment of the Trust Fund Recovery Payment against Graham was proper, and Graham is not entitled to a refund under 28 U.S.C. § 1346(a)(1).

DATED:  February 28, 2013

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE